IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM GROVE, SR, VIRGINIA B. GROVE, SANDRA PALMIERI, MICHAEL G. FUHRMAN, WILLIAM WINTER, PRESTON HIMES, and EDWARD MYERS,** *on behalf of themselves*; **and FLOYD MITZEL, MAURICE KEFAUVER, III, HAROLD G. LUCKENBAUGH, WILMER C. BARRETT, LARRY LEHMAN, GERALD A. YOUNG, and JOHN C. DOUGLASS,** *on behalf of themselves and others similarly situated*; **and INTERNATIONAL UNION UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,** | : : : : : : : : : : : : : : : : : : : : : : | **Civil No. 1:12-CV-02622** |
| **Plaintiffs** | : : : | |
| **v.** | : : : : | |
| **JOHNSON CONTROLS, INC, JOHNSON CONTROLS, INC. UNION RETIREE WELFARE PLAN (PLAN 570), JOHNSON CONTROLS, INC. UNION WELFARE PLAN (PLAN 565), and DOES 1 through 20,** | : : : : : : : : : | |
| **Defendants** | : : | **Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

In this civil action brought pursuan t to the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001,  and the Labor Managem ent Relations

Act ("LMRA"), 29 U.S.C. § 141, Plaintiffs    allege that Defendants violated their

rights to retiree health benefits. Presently   before the court are the parties' cross-

motions for summary j udgment (Docs. 95 & 97),  as well as Plainti ffs' motion to

strike Defendants' objections to certain   paragraphs of Plaintiffs' statement of material facts (Doc. 105). Upon consideration of the motions and for the reasons discussed herein, the court will deny Plaintiffs' motion to strike and partial motion for summary judgment and will grant Defendants' motion for summary judgment in its entirety.

## I.   **Background**

Plaintiffs Floyd Mitzel, Maurice Kefauver III, Harold G. Luckenbaugh, Wilmer C. Barrett, Larry Lehman, Gerald A. Young, and John C. Douglass ("Class Representatives") filed this action on behalf of themselves and similarly-situated groups of retirees ("Retirees   "), including the additional individually-named Plaintiffs, who were previously represented by Plaintiff International Union United Automobile, Aerospace and   Agricultural Implement Workers of America ("UAW") and its Local Union No. 1872 (together with UAW, the "Union"). (Doc. 85, ¶ 1.) By order dated   December 3, 2014, the court   certified six subclasses of plaintiffs, denoted as Subclasses A, B, C,   D, E and F, grouping retirees into these subclasses based on their respective dates of retirement. (Doc. 88, pp. 8-10 of 10.) In that order, the court   appointed Plaintiff Douglass as Class Representative for Subclass A; Plaintiff Young as Class Rep   resentative for Subclass B; Plaintiff Kefauver as Class Represent ative for Subclass C; Plaintiffs Luckenbaugh and Barrett as   Class Representati ves for S ubclass D; Plaintiff Mitzel as Class

Representative for Subclass E; and Plaintiff Lehman as Class Representative for Subclass F. (*Id.*)

Defendant Johnson Controls, Inc. ("Johnson Controls" or, with its predecessors in interest, "the Company"), is a Wisconsin corporation engaged in the business of manufacturing products and offering services related to energy and operational efficiency of buildings, automotive batteries, electronics, and interior systems for automobiles. (Doc. 95-1, ¶ 9.) Since 2005, Johnson Controls has operated a manufacturing plant in York, Pennsylvania (the "York Plant") after acquiring it from York International Corporation ("York International") via a merger. (*Id.*) Defendants Johnson Controls, Inc. Union Retiree Welfare Plan and Johnson Controls, Inc. Union Welfare Plan (collectively, the "Plan") are employee benefit plans within the meaning of ERISA. (*Id.* at ¶ 12.)

Every few years since 1973, the Union has negotiated a collective-bargaining agreement ("CBA") with Johnson Controls or its predecessors relating to, *inter alia*, active and retiree health insurance benefits for both employees and former employees of the York Plant. (Doc. 95-1, ¶ 17.) Each CBA incorporated by reference a separate booklet, the "Group Insurance Program" ("GIP"), that specifically addressed health and welfare benefits. Throughout the years, these health benefits remained fairly consistent from agreement to agreement. However, in 2009, Johnson Controls unilaterally reduced retiree health benefits by instituting

a $50,000.00 lifetime cap on benefits payable for each participant sixty-five years of age and older. (Doc. 95-1, ¶ 15.) As a result of the cap, some subclass members are no longer eligible for retiree healthcare benefits because they have reached the $50,000 lifetime coverage limit. (*Id.* at ¶16.)

## A.   The Agreements

The relevant CBAs in effect at the time the members of each subclass retired are set forth in detail below.

### 1.   Subclass A

The CBAs and GIPs in effect prior to November 1, 1984 govern Subclass A, the members of which retired prior to this date.

#### a.   The 1973, 1975, and 1978 CBAs

Beginning in 1975, the CBAs negotiated between the Union and the Company provided for health and welfare benefits through an insurance program that was described in the corresponding GIP. Article 35 of each CBA incorporated the GIP by reference "subject to all provisions of this Agreement." (*See, e.g.*, Doc. 97-9, p. 125 of 169. ) One such provision was the durational clause appearing in Article 37, which set forth the plan effective date and termination date. For instance, the 1973's durational clause provided as follows:

> This Agreement shall become effective as of November 1, 1973 and shall remain in full force and effect until midnight October 31, 1975 and shall continue from year to year thereafter, unless at least sixty (60) days prior to November 1, 1975 either party gives

> written notice to the other of their intention to m odify or terminate
> same.

(Doc. 97-4, p. 100 of 129.)  With each new CBA, the parties would publish a new

GIP to correspond with the effective period of that particular CBA.

### b.      The 1981 CBA

Similar to earlier versions of the CBA, the durational clause of the 1981

CBA provided as follows:

> This  Agreement shall become eff ective  as of November 1, 1981
> and shall remain in full force and effect u ntil midnight October 31,
> 1984,  and shall continue from year     to  year thereafter, unless at
> least sixty (60) days prior to N ovember 1, 1984, eit her party gives
> written notice to the other of their intention to m odify or terminate
> same.

(Doc. 97-9, pp. 142-43 of 195.)  The CBA incorporated the 1981 GIP by reference:

> The  parties have provided for   a  Group Insurance Program   in a
> separate booklet which is part of this Agreement as if set out in full
> herein, subject to all provisions of this Agreement.

(Doc.  97-9, p. 142 of 195.) As to me      dical  benefits, the 1981 GIP stated, in

pertinent part:

> Employees who retire under the Normal, Early, or Disability
> Retirement  Provisions  of York Pension Plan No. 4 and their
> eligible dependents *shall have the following benefits (as described
> in this booklet) continued* after retirement at no cost:
>
> -Hospital Expense Benefits
> -Surgical Expense Benefits
> -Medical Expense Benefits
> -Diagnostic X-Ray & Laboratory Benefits
> -Prescription Drug Benefits

**Benefits NOT Continued After Retirement**

Upon retirement, employees will no longer be insured for Accidental Death and Dismemberment, Survivor Income, Accident and Sickness, Long Term Disability, Vision Care or Dental Benefits.

(*Id.* at p. 69 of 79 (emphasis added).)

### 2. Subclass B

The CBAs and GIPs in effect from November 1, 1984 to October 31, 1996 govern the members of Subclass B, who retired between those dates. The relevant provisions of those documents are provided below.

### a. The 1984 and 1987 CBAs

As with prior versions, the 1984 CBA was effective from November 1, 1984 until midnight October 31, 1987 (Doc. 97-11 , p. 97 of 141), and incorporated a GIP in a separate booklet "as if set out in full" therein ( *id.*). The 1984 GIP contained provisions related to termination of health coverage as follows:

**Termination of Insurance**

Your health insurance is continued *until your death* – unless you request termination of insurance or you do not make the required contribution for this plan.

And your dependents' health insurance *will be continued – while you are living – until the date they no longer qualify as your eligible dependent*, or until you request termination of dependent coverage or do not make the required contributions.

**Continuation of coverages for your survivors**

If you die after retirement, health coverage may be continued for your spouse and children, provided the required contributions are paid . . . .

Your spouse will remain eligible *until the earlier of death or remarriage*. Your children will remain eligible until your spouse is no longer eligible, or the children are no longer eligible (due to age, marriage, etc.), whichever is earlier.

**Plan termination**

In the event this group plan is terminated, coverage for you and your dependents will end immediately.

(Doc. 97-12, pp. 94-95 of 175 (emphasis added.) The 1984 GIP further stated that there was no overall limit on medical coverage or a lifetime maximum under the Plan. (*Id.* at p. 88 of 175.) The 1984 GIP, however, did set a $15,000 lifetime limit "for combined mental and nervous conditions, psychiatric disorders, alcoholism and drug abuse expenses of each individual." (*Id.*) In addition, retirees under the age of sixty-five were required to pay a $15.50 monthly contribution toward their health benefits, but the requirement was waived for retirees over sixty-five years of age. (*Id.* at p. 93 of 175.) The 1984 GIP also included a section entitled "Future of the Plans," which reads:

Although the company expects and intends to continue the plan indefinitely, it reserves the right to modify, amend, suspend or terminate them at any time.

(*Id.* at p. 162 of 175.)

7

Similar to the 1984 CBA, the 1987    CBA set forth a specific duration of effectiveness – November 1, 1987 to October 31, 1990 – and incorporated the 1987 GIP booklet by reference "subject to all provisions of this Agreement." (Doc. 97-13, p. 103-04 of 153.) The overall lifet    ime limit remained "none," while the maximum payment "for com bined mental and nervous cond itions, psychiatric disorders, alcoholism and drug abuse" incr eased to "$25,000 per lifetime effecti ve January 1, 1988." (Doc. 97-14, p. 88 of 153.)    Monthly contributions by retirees under age sixty-five also increased to $17.90. (*Id.* at p. 93 of 163.) The 1987 GIP described the term ination of retiree medical benefits identically to the 1984 GIP provisions. (*Id.* at pp. 93-94 of 163.) Finally, the 1987 GIP contained a "Fut ure of the Plans" clause providi ng that, "[a]lthough the company expects and intends to continue the plans indefinite ly, the Company reserves the right to m odify, amend, suspend or terminate the plans at any time." (*Id.* at p. 150 of 163.)

### b.    The 1990 and 1993 CBAs

The  1990 and 1993 CBAs included durational clauses and incorporated corresponding GIPs. (Doc 97-15, p. 103-04 of 157; Doc. 97-17, p. 103-04 of 159.) Both  GIP booklets contained the same te     rmination of coverage clauses that continued health benefits until death, excerpted above for the 1984 GIP, along with identical "Future of the Plans" clauses reserving the Company's right to "modify, amend, suspend or terminate the plans at any time." (Doc. 97-16, p. 81, 122 of 130;

Doc. 97-18, p. 81, 122 of 130.) No cha    nges were made to   the overall lifetime maximum plan payments, but t he amount "for [the] combined mental and nervous conditions,  psychiatric disorders, alcoho  lism  and drug abuse expenses of each individual" was raised to $30,000 per lifetime. (Doc. 97-16, p. 77 of 130; Doc. 97-18, p. 77 of 130.)

### 3.    Subclasses C, D, and E

The members of Subclasses C, D,   and E are governed by the 1996, 2000, and 2003 CBAs and GIPs, respectively.

### a.    1996 CBA

The 1996 CBA was in effect from July 1, 1996 until June 30, 2000 (Doc. 97-19, p. 103 of 161), and, as with all prev  ious versions, incorporated its GIP "in a separate booklet" (*id.* at p. 102 of 161).   Beginning in 1996,  however, the parties departed from the custom ary practice of  producing  one GIP booklet and i  nstead published two: one for active employees and another for retirees.

The 1996 GIP for active em ployees expressly reserved for the Com pany the right to "modify, amend, suspend or  terminate the benefits plan." ( *Id*. at p. 93 of 97.) This language, however, was absent from the GIP booklet for retirees.

The  1996 GIP retiree booklet    did, however, provide the following terms regarding retiree benefits and termination:

**1.14 Conversion to an individual health insurance policy**

When your group cove rage terminates, you may apply for an individual health policy without having to prove good health. . . .

**1.15 Termination of Coverage**

Your coverage is continued *until your death* – unless you request termination of coverage or you do not make the required contribution for this plan.

And your dependents' health coverage *will be continued – while you are living – until the date they are no longer qualified as your eligible dependents*, or you request term ination of dependent coverage or do not make the required contributions.

**1.16 Continuation of coverage for your survivors**

If you die after retirement, health coverage may be continued for your spouse and children, provided the required contri butions are paid. . . .

Your spouse will remain eligible *until the earlier of death or remarriage*. Your children will remain eligible until your spouse is no longer eligible, or the children are no longer eligible (due to age, marriage, etc.), whichever is earlier.

**1.17 Plan Termination**

In the event this group is term inated, coverage for you and your dependents will end immediately.

(Doc. 97-21, pp. 11-12 of 51 (em phasis added).) The retiree bookl et further provided that there was "no overall lim it on how much the plan will pay for one person's medical bills." (*Id.* at p. 15 of 51.)

### b.      The 2000 CBA

The 2000 CBA between the Company and the Union was in effect from July 1, 2000 until June 30, 2003 and again incorporated a separate GIP. (Doc. 97-22, p. 98-99 of 173.) As in the previous CBA, the parties published separate GIP booklets for  employees and retirees. The active em     ployee  GIP booklet reserved to the Company "the right to modify, amend, suspend or terminate the Plans at any time," (Doc. 97-23, p. 89 of 93), while the retiree booklet contained no such clause.

Instead, the retiree booklet supplied id entical terms to the 1996 GIP retiree booklet regarding the duration and termination of benefits. (Doc. 97-24, pp. 10-11 of 50.) In addition to the 1996 GIP re tiree booklet, however, the 2000 retiree GIP booklet provided retirees with  additional coverage if th ey sought treatment from a preferred provider. (*Id.* at pp. 13-14 of 50.) The      2000  GIP retiree booklet also added a wellness benefits section  absent from previous editions. (*Id.* at pp. 19-22 of 50.) The booklet contained no overall lifetime limit for plan coverage of medical bills. (*Id.* at pp. 13, 15 of 50.)

### c.      The 2003 CBA

The 2003 CBA was in effect from   July 1, 2003 until July 30, 2006. (Doc. 97-25, pp. 112-13 of 184), and incorpora ted a separate GIP booklet subject to all provisions of the CBA ( *id.* at pp. 112-13 of 184).   Once again, the Plan provided separate GIP booklets for employees and retirees. The 2003 GIP active em ployee

booklet conferred upon the Co mpany "the right t o modify, amend, suspend or terminate" any plans. (Doc. 97-26, p. 89 of 93.) The retire booklet, however, did not contain a similar clause.

The 2003 GIP retiree booklet contained identical term s to the previous two GIP retiree booklets regarding the duration of benefits, their term ination, and potential conversion to an in dividual health insurance policy. (Doc-97-27, pp. 12-13 of 55.) No maxim um lifetime limits were set as to how m uch the Plan would pay toward an individual's medical bills. (*Id.* at pp. 15, 17 of 55.)

### 3.    Subclass F

The CBA in effect from July 31, 2006 to Jul y 31, 2009 ("2006 CBA") governs the insurance benefits for Subc lass F, the m embers of which retired between those dates.

The 2006 CBA, which was the first with Johnson Controls as the em ployer of the York Plant em ployees, provided a durational clause and separate GIP booklet. (Doc. 97-28, pp. 106-09 of 175.) For t he first time in many years, however, only one GIP booklet was provided.

Unlike previous versions, the GIP bookl et stated on its cover that it was a "Summary Plan Description." (Doc. 97-29.) On the first page, in the initial section entitled "INTRODUCTION," the document confirmed the Com pany's right to amend or terminate the benefits plans, stating:

>**Reminder: Employer's Right to Amend or Terminate the Plans.** While the Summary Plan Desc ription summarizes the mai n terms and conditions of the Johns on Controls em ployee benefits program, please remember that Johnson Controls, Inc. reserves the right to amend or terminate the benefits program or any porti on of it at any time by action of the   Policy Committee or the Board of Directors either as a result of co llective bargaining requirement or at the expiration of the collect ive bargaining agreement with the union.

(*Id*. at p. 3 of 108.) The 2006 Summary       Plan  Description also addressed termination of benefits for retirees as follows:

>**WHEN COVERAGE ENDS**
>
>Generally, your part icipation in the Group Benefits Program for Retired Employees ends on t he date of your death unless you request termination of coverage or when you cease to m ake the required contributions for thi s plan. Your dependents' coverage ends at the same time your par    ticipation ends, or when your dependent ceases to qualify as an eligible dependent, if earlier.
>
>Once enrolled, you may disconti  nue coverage fo r yourself or dependents at any time upon written notification to [the]  Benefits Service Center.
>
>If you di e after retirement, m edical plan cove rage may be continued for your e ligible dependents (spouse and/or child(ren)), provided the required contributions are paid in a timely manner. To qualify for continued coverage,   your spouse m ust have been married to you for at least one year at the time of your death. Your spouse will remain eligible for continued benefits until the earlier of death or rem arriage. Your dependent children will remain eligible until your spouse is no longe r eligible or the children are no longer eligible (due to age, marriage, etc.), whichever is earlier.

(*Id.* at p. 79 of 108.)  The 2006 Sum      mary  Plan Description also contained a

separate  provision detailing the Com     pany's  right  to amend or terminate the

benefits at any time as follows:

### PLAN AMENDMENT OR TERMINATION

> The company reserves the right to  amend or terminate the benefits
> program  or any port ion  of it a t  any tim e  by action of the Policy
> Committee  or Board of Directors.   . . .   The co mpany's  right to
> amend  the benefits program in     cludes,  but i s  not lim ited  to,
> changing  the amounts required to be contributed by the company
> and/or  the employee for the purchase  of benefits, level of benefit s
> provided   and the class or classe        s  of em ployees  eligible to
> participate.

(*Id.* at p. 105 of 108.)

In  addition  to the reservation of    rights  clauses, the 2006 Summary Plan

Description  removed  the unl imited  lifetime  benefits  available to retirees and

introduced  "a post -65,  individual,  non-reinstateable  maximum  lifetime lim it  of

$500,000  on m edical  plan (including pres  cription  drug) claim s  paid under t  he

plan."[2] (*Id.* at p. 79 of 108.) While retirees over sixty-five years of age did not have

to  make  monthly  contributions, those   under  that threshold faced significant

increases.  If the former employees retired before February 1, 2004 – during which

the 2003 CBA theoretically controlled – monthly contributions remained at $17.90.

(*Id.*) Employees retiring after February 1, 2004, however, were required to pay $65

---

[2] Johnson Controls, Inc. later instituted a $50,000 lifetime benefit maximum on retiree benefits
which prompted this litigation. (Doc. 85, ¶ 4; Doc. 87, ¶ 4.)

per month, with the cost increasing appr oximately ten dollars each year for the time remaining under the 2006 CBA. ( *Id.* at p. 80 of 108.) Finally, while previous GIPs had required only ten years of serv ice to beco me eligible for em ployee benefits, the 2006 Summary Plan Descrip tion required "t en or m ore years of continuous service" and that the indivi dual had been "a full-tim e regular uni on employee hired prior to April 1, 1985." (*Id.* at p. 71 of 102.)

### B.    <u>Procedural Background</u>

Plaintiffs commenced this action by filing a co mplaint on Decem ber 31, 2012 (Doc. 1), followed by an amended complaint on March 21, 2013 (Doc. 27), after each individual plaintiff had exceeded the plan benefits cap and had his or her benefits terminated. Plaintiffs' first amended complaint brought the following counts: (1) Count I – Violation of Labor Agreements Actionable under Section 301 of the LMRA against all Defendants;    (2) Count II – V iolation of Em ployee Welfare Benefit Plan Actionable under    Section 502 of ERISA against all Defendants; (3) Count III – Breach of Fi duciary Duty under ERISA Section 404 and 502 against Defendant Johnson Controls; and (4)    Count IV – Equitable Estoppel under ERISA and LMRA Secti on 301 against all Defendants. ( *See generally id.*) Plaintiffs requested declar ative, equitable, and injunctive relief as well as an award of attorneys' fees. (    *Id.*, Prayer for Relief, ¶¶ B-I.) After Defendants moved to dismiss Plaintiffs' claim in their entirety, the court issued an

order dated June 17, 2013 denying the motion as to the first three counts, but dismissing the equitable estoppel claim. (Doc. 42; *see Grove v. Johnson Controls, Inc.*, Civ. No. 12-cv-2622, 2013 WL 3049114 (M.D. Pa. June 17, 2013)). On June 10, 2015, Plaintiffs withdrew "their claim for breach of fiduciary duty" or Count III – Breach of Fiduciary Duty under ERISA §§ 404 and 502 against Defendant Johnson Controls. (Doc. 102, p.4 n.5 of 43.)

On August 2, 2013, Wilmer C. Barrett and the Union filed a related class action complaint regarding the same underlying issues. *See Barrett v. Johnson Controls, Inc.*, Civ. No. 13-cv-2071, Doc. 1 (M.D. Pa. Aug. 2, 2013). By order dated October 10, 2013, the court consolidated *Barrett*, into the captioned action. Thereafter, Plaintiffs in the consolidated cases filed a Second Amended Complaint (Doc. 54), which reflected the consolidation of these actions by merging *Barrett's* class action allegations (*see Barrett* Doc. 1) into *Grove's* operative First Amended Complaint (*see* Doc. 27), with *Grove's* individual plaintiffs acting as the putative class representatives. Plaintiffs then filed their Fourth Amended Complaint on October 28, 2014. (Doc. 79.) By order dated December 3, 2014, the court certified Subclasses A, B, C, D, E, and F, grouping retirees into subclasses based on date of retirement. (Doc. 88.)

On April 29, 2015, Plaintiffs filed a motion for partial summary judgment (Doc. 95) and a brief in support (Doc. 96) as to Subclasses C, D, and E. On May

20, 2015, Defendants filed a response to    Plaintiffs' motion for partial summary judgment and a cross-motion for summary judgment (Doc. 97), along with a brief in support (Doc. 99), as to all of Plainti    ffs' claims.  Plaintiffs filed a brief in opposition to Defendants' m otion for summary judgment and a reply to Defendants' response on June 10, 2015.  (Doc. 102.)  On July 1, 2015, Defendants filed a reply to Plaintiffs' opposition.  (Doc. 108.)  On June 6, 2015, Plaintiffs filed a motion to strike objections to and deem admitted certain paragraphs of Plaintiffs' statement of m aterial facts.  (Doc. 105.)   On June 29, 2015, Defendants filed an opposition to the motion to strike (Doc. 107), and Plaintiff replied on July 16, 2015 (Doc. 109).

Thus, this matter has been fully briefed and is ripe for disposition.

## II.   **Plaintiffs' Motion to Strike**

Plaintiffs' motion to strike challenges the admissibility of certain evidentiary challenges relied upon i n Defendants' response to    Plaintiffs' statement of undisputed facts in support of their m otion for partial summary judgment. Plaintiff contends  that the facts Defendants ch    allenge  are properly supported with admissible evidence and that Defendants fa iled to cite any evidence showing these facts are genuinely disputed.

Under Local Rule 56.1, a m otion for summary judgment requires a party to file an accompanying "short and concise st atement of the material facts ." A party

may then "object that the material cited    to  support or dispute a fact cannot be

presented  in a form that would be adm        issible  in  evidence." F ed.  R. Civ. P.

56(c)(2). Generally, motions to strike attack pleadings that present "an insufficient

defense or any redundant, imma terial, impertinent or scandalous matter." Fed. R.

Civ. P. 12(f).   In practice, this court ha s entertained motions to strike attacking the

opposing party's statements of material fact or supporting affidavits. *See, e.g.*, *York*

*Int'l Corp. v. Liberty Mut. Ins. Co.*, Civ. No. 10-cv-0692, 2015 WL 4162981 (M.D.

Pa. July 9, 2015); *Gloria Lytle v. Capital Area Intermediate Unit*, Civ. No. 05-cv-

0133, 2009 WL 82483 (M.D. Pa. Jan. 9, 200 9). While a party may hope to exclude

its  opponent's  material facts due to thei  r  potential inadm issibility at trial, legal

arguments, however, may not be excluded.

Here, Plaintiffs attempt to strike Defendants' legal arguments disputing the

introduction  of twenty-t hree paragraphs of Plaintiffs' material facts. Because t he

court finds that a m otion to strike is an in appropriate vehicle in which to attack an

opposing party's legal argumen t in response to a statement of m  aterial facts, the

motion will be denied.

## III.   Cross-motions for Summary Judgment

In considering the instant m otion for summary judgment, the court relied on

the uncontested facts  or, if the facts were  disputed, viewed the facts an d deduced

all reasonable inferences therefrom in th e light most favorable to the nonm oving party. *See Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 362 (3d Cir. 2008).

## A.   <u>Legal Standard</u>

Summary judgment is proper when the record, taken in its entirety, shows that "there is no genuine dispute as to an y material fact and the movant is entitled to judgment as a matter of la w." Fed. R. Civ. P. 56(a);   *Hefferman v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015). "An issue is genuine only if there is a sufficient evidentiary basis on which a   reasonable jury could fi nd for the non-moving party, and a factual dispute is m aterial only if it might affect the outcome of the suit under governing law." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The court must "view the record in the light  most favorable to t he non-moving party and draw all reason able inferences in that party's favor." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d  Cir. 2014) (citing *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 (3d Cir. 2007)).   However, the "court  may not m ake credibility determinations or engage in any weighing of the evidence." *Montone v. City of Jersey City*, 709 F.3d 181, 191 (3d  Cir. 2013) (quoti ng *Marino v. Indus. Crafting Co.*, 358 F.3d 241, 247 (3d Cir. 2004)).

The moving party bears the in itial burden to show an "absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party satisfies its burden, the burden shifts to the non-moving party to "go beyond the pleadings" and "designate specific facts showing th at there is a genuine issue for trial." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (quoting *Celotex Corp.*, 477 U.S. at 324)).

"A party's failure to make a showing that is 'sufficient to establish the existence of an element esse ntial to that party's case, and on which that party wil l bear the burden of proof at trial[,]' mandates the entry of summary judgm ent." *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 857-58 (3d Cir. 2000) (quot ing *Celotex Corp.*, 477 U.S. at 322). A court shoul d also grant summary judgment when the party's evidence "is merely col orable or is not significantly probative." *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 390 F.3d 262, 267-68 (3d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). In sum, an opposing party m ust provide m ore "than some metaphysical doubt as to the material facts." *Chavarriaga v. New Jersey Dept. of Corr.*, 806 F.3d 210, 218 (3d Cir. 2015).

Although it can present a "formidable ta sk," the court is permitted to resolve concurrent cross-motions for summary judgm ent. *InterBusiness Bank, N.A. v. First Nat'l Bank of Mifflintown*, 318 F. Supp. 2d 230, 2 35 (M.D. Pa. 2004) (citi ng 10A Charles Alan Wright *et al.*, FED. PRACTICE & PROCEDURE § 2720 (3d ed.

1998)).  Nonetheless, "the ru le is no di fferent where there are cross-m otions for summary judgment." *Lawrence v. City of Phila., Pa.*, 527 F.3d 299, 300 (3d Cir. 2008). "Inferences to which a party is    entitled with respect to the opponent's motion may not be granted with respect to its own. " *Falls v. State Farm Ins. Mut. Auto Ins. Co.*, 774 F. Supp. 2d 705, 709 (M.D. P  a. 2011) (quoting *InterBusiness Bank, N.A.*, 318 F. Supp. 2d at 236).

## B.   Welfare Benefits under the LMRA and ERISA

Plaintiffs  assert their claim  s  under  the LMRA and ERISA for welfare benefits denied to them through alleged violations of be nefit plans. When disputes arise  between em ployers and labor uni ons  pursuant to a collective bargaining agreement, the LMRA grants federal cour ts jurisdiction to resolve them. 29 U.S.C. § 185(c).  Under ERISA, plan beneficiarie s may bring civil  actions "[t]o recover benefits due to [them] under the term s of [the] plan, to enforce [their] rights under the terms of the plan, or to clarify [their] rights to future benefits under the terms of the  plan." 29 U.S.C § 1132(a)(1)(B). ER    ISA,  however, distinguishe s  between pension  and  welfare benefit plans.   *Int'l Union United Aerospace and Agric. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 137 (3d Cir. 1999). Although ERISA directs welfare pl ans to be "maintained pursuant to a written  instrument,"  29 U.S.C. § 1102(a)(1),   employers re main "generally free under  ERISA, for any reason at any time, to    adopt, m odify or term inate welfare

plans." *M & G Polymers USA, LLC v. Tackett*, ___ U.S. ___, ___, 135 S. Ct. 926, 933 (2015) (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)).   Plan participants therefor  e  bear "the burden of proving, by a preponderance of the evidence, that the em ployer intended the we lfare benefits to be vested." *Skinner*, 188 F.3d a t 138-39 (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 58 F.3d 896, 901 (3d Cir. 1995)).

## C.   <u>Vesting of Welfare Benefits</u>

The United States Supreme Court recently held that, in determining whether an employer intended to vest welfare bene  fits, courts must "interpret collective bargaining agreements, includi ng those es tablishing ERISA plans, according to ordinary principles of contract law, at      least when those principles are n     ot inconsistent with federal labo r policy." *Tackett*, 135 S. Ct. at 933 (citing *Textile Workers v. Lincoln Mills of Ala.*, 353 U.S. 448, 456-57 (1957)). Pl  aintiffs and Defendants disagree as to what im pact the Supreme Court's decision in  *Tackett* generated on the Third Circuit's holding in *Skinner*, which requires "an employer's commitment to vest [ERISA] bene fits . . . [to ] be stated in  *clear and express language*." 188 F. at 139 (emphasis added).

In *Skinner*, after a series of CBAs were  negotiated between the parties over the course of twenty years, the defendant  retroactively modified or terminated life and health insurance benefits for form er employees who had retired pri or to the

22

effective date of the most recent CBA. *Id.* at 134-36. The plaintiffs challenged the disruption of their benefits, arguing th at specific language in the CBAs denoting that the benefits "will continue" and "sha ll remain," had vested lifetime benefits during each of the previous CBAs. *Id.* at 140.

In part, the plaintiffs in *Skinner* urged the Third Circuit to adopt the Sixth Circuit's presumption "that the parties [to a CBA] intend[] retiree welfare benefits to continue for li fe, notwithstanding the expiration of a collective bargaining agreement." *Id.* at 140 (citing *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man, Inc.*, 716 F.2d 1476, 1482-83 (6th Cir. 1983)). The dispute in *Yard-Man*, as in *Skinner*, arose from the termination of benefits for retirees at the expiration of a CBA. *Skinner*, 188 F.3d at 139. When faced with the specific CB A provision at issue sta ting that "the Comp any *will provide insurance benefits equal to the active group benefits* . . . for the former employee and his spouse," the *Yard-Man* court found the italicized phrase ambiguous. *Id.* at 139 (quoti ng *Yard-Man*, 716 F.2d at 1480-81). After reviewing other provisions of the CBA for evidence of intent, the Sixth Circuit concluded that the retiree benefits were vested and c ontinued beyond the duration of t he CBA. *Id.* In concluding that the CBA' s "general durational clause [was ] insufficient to defeat vesting," the Sixth Circu it relied prim arily on two factors. *Id.* at 140 (quoting *Yard-Man*, 716 F.2d at 1482-83). First, the *Yard-Man* court reasoned that

retiree benefits ordi narily vest becaus e they are "perm issive[,] not mandatory subjects of bargaining." *Id.* (quoting *Yard-Man*, 716 F.2d at 1482). Second, the Sixth Circuit "viewed retiree b enefits as 'status' benefits which carried with them an inference that they continue so long as the prerequisite status is maintained." *Id.* (quoting *Yard-Man*, 716 F.2d at 1482).

"The Sixth Circuit, therefore, adopt ed what has becom e commonly known as the ' *Yard-Man inference*,' pursuant t o which courts presume that the parties intended retiree welfare benefits to continue for life, notwithstanding the expiration of a collective bargaining agreement." *Id.* To courts within the First, Fourth, Sixth, and Eleventh Circuits, this inference ex erted a fair am ount of infl uence on how these cases were resolved. *Id.* In *Yard-Man*, for instance, the inference was s o strong that the court rej ected the co mpany's argument that the general durationa l clause, which provided for the ter mination of t he CBA on a particular date, defeated any inference that the retirement benefits had vested. *Id.* The Fifth and Eighth Circuits, however, declined to follow the *Yard-Man* inference. *Id.*

After a thorough analysis of *Yard-Man* and its progeny, the *Skinner* court also declined to follow the *Yard-Man* inference, and specifically rejected the "Sixth Circuit's view that retiree ben efits are 'status' benefits which carried with them an inference that th ey continue so long as the prerequisite status is maintained." *Id.* Instead, the Third Circuit agreed with the reasoning of the Eighth

Circuit that Congress had "e xplicitly exempted welfare benefits from  ERISA's vesting requirements," and therefore any   presumption in favor of vesting was likely contrary to Congressional intent. *Id.* at 140-41 (quoting *Anderson v. Alpha Portland Indus., Inc.*, 836 F.2d 1512, 1517 (8th Cir. 1988)). Specifically, the Third Circuit found that Congress ha d intentionally "reject[ed] the automatic vesting of welfare benefits" because "to require the ve sting of those ancilla ry benefits would seriously complicate the administration  and increase the cost of plans whose primary function is to provide retirem ent income." *Id.* at 138 (quoting  *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3 d Cir. 1990)). The *Skinner* Court further reasoned that "to vest benefits is to render them forever unalterable." *Id.* at 139. "Because ves ting  of welfare p  lan  benefits  constitutes an extra-ERISA commitment," the Third Circuit im  posed the requirement that "an em  ployer's commitment to vest such bene fits . . . not be inferred lightly a nd must be stated in *clear and express language.*" *Id.* (emphasis added).

Applying that standard to the phra ses "will continue" and "shall remain" in the relevant provi sions of the CBAs before   the c ourt without the benefit of the *Yard-Man* inference, the Third Circuit found t hat a plain reading of those phrases "does not *unambiguously* indicate that benefits will continue  *ad infinitum.*" *Id.* at 141. The court explained as follows:

> It cannot be said that the phrases clearly and expressly indicate
> vesting since there is sim ply no durational language to quali fy

> these phrases. That is, the CBAs do not state that retiree
> benefits 'will continue for the life of the retiree,' or that they
> 'shall remain unalterable for the life of the retiree.' An equally
> reasonable interpretation is that the benefits 'will continue until
> the CBA expires,' or that they 'shall remain . . . until the CBA
> expires.'

*Id.* The court opined that the latter interpretation appeared more reasonable in light

of the durational provisions included in all of the CBAs, noting the following CBA

provision as illustrative:

> "This Agreement represents a complete resolution of all
> noneconomic items and shall, in all of its terms, remain in effect
> from July 1, 1986 until midnight, June 30, 1989."

*Id.* Read in conjunction with such a durational clause, the Third Circuit determined

that the phrase "will continue " "could be interpreted to mean, for instance, that

medical benefits 'will continue until midnight of June 30, 1989.'" *Id.* Relying on

the Second Circuit's decision in *Joyce v. Curtiss-Wright Corp.*, 171 F.3d 130 (2d

Cir. 1999), the court found that the language of the CBAs did not unambiguously

vest lifetime retiree benefits, noting that the retirees' contentions to the contrary

"constituted 'extensive linguistic contortion' in an attempt to 'manufacture'

ambiguity where it did not exist." *Id.* at 142 (quoting *Joyce v. Curtiss-Wright

Corp.*, 171 F.3d 130, 134 (2d Cir. 1999)). The Third Circuit thus refused to "infer a

binding obligation to vest benefits absent some language that itself reasonably

supports that interpretation." *Id.* (quoting *Joyce*, 171 F.3d at 135).

The Third Circuit likewise rejected the retirees' alternative argument that the phrases "will continue" and "shall rema   in" are am biguous,  thereby precluding summary  judgment,  because t he  phrases c ould  be interpreted to mean that the employer  would pa y  for benefits  for the life of the retire    e. *Id.*  Noting  that  the premise of this argument appeared to be  that the phrases have prospective meaning only,  the Third Circuit observed that the    structure of the cont ract,  construed as a whole, "reveal[ed] that just t he opposite was intended,  that the term s were used to refer back to previous CBAs."  *Id.*  As an example, the cour t pointed out that when the amount of coverage was increased from the prior CBA, the agreements utilized the  phrase "shall be increased   ."  *Id.*  However, when th  e  amount  of coverage stayed  the same, the agreements   used  the phrase, "shall remain."   *Id.*  at 142-43. Similarly,  when a new type of covera      ge  was obtained, the agreements used language  such as "will provide," but when      the coverage was the same kind as furnished  under the prior CBA, the la nguage used was "will continue."  *Id.*  Thus, "[r]ather  than indicating a promis  e  on the  part  of the com pany  to provide such coverage prospectively for the life of the  retiree," the court found that "the phrases were  used to indicate a continuation of   *prior* practices and policies."  *Id.*  at 143. The court noted that the retirees' reading w ould only have legitimacy if viewed in a "vacuum, without considering the appropriate contexts in which they were used." *Id.*

In the instant case, Plaintiffs argue that the Supreme Court's decision in *Tackett* rejected all presumptions for or against vesting, including the Third Circuit's "clear and express" standard, and therefore *Skinner* is no longer good law.[4] *See Tackett*, 135 S. Ct. at 933;  *see also Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Emp. Health and Welfare Plan*, 298 F.3d 191, 196 (3d Cir. 2002) (acknowledging that *Skinner's* standard amounts to a presumption against vesting in cases involving welfare benefit plans). The court disagrees.

In its unanimous decision, the Supreme Court rejected the inferences set forth in *Yard-Man* and its progeny, and reaffirmed that collective bargaining agreements are to be interpreted "according to ordinary principles of contract law."

---

[4] Plaintiffs rely, in part, on Justice Ginsburg's four justice concurrence, in which she stated that, "[c]ontrary to M&G's assertion, . . . no rule requires 'clear and express' language in order to show that parties intended healthcare benefits to vest." *Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring). Instead, an employer may still be constrained after the collective-bargaining agreement's expiration by both explicit and "implied terms." *Id.* (citing *Litton Fin. Printing Div., Litton Business Systems, Inc., NLRB*, 501 U.S. 190, 207 (1991).) However, contrary to Justice Ginsburg's assertion that "no rule requires 'clear and express' language" in order to vest benefits, the unanimous *Tackett* Court issued no specific holding on this point, even though the Court was presented with a question related to the Third Circuit's requirement of "a clear statement that health-care benefits are intended to survive the termination of the collective bargaining agreement." Question Presented, No. 13-1010,  *Tackett*, 134 S. Ct. 2136 (2014), http.www.supremecourt.gov/qp/13-01010qp.pdf. Although a concurrence may carry persuasive value, "federal courts should not give 'much precedential weight' to a concurring opinion, even if it coheres with the majority opinion." *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 285 n.5 (2001)). Indeed, a majority opinion does not become "coextensive with the concurrence because their opinion does not expressly preclude . . . the concurrence's approach." *Alexander*, 532 U.S. at 285 n.5. Such a result would place the majority in "an odd predicament if a concurring minority of the Justices could force the majority to address a point they found it unnecessary (and did not wish) to address." *Id.* Therefore, as the unanimous *Tackett* Court refused to address the Third Circuit's clear and express language standard, the court declines to follow Justice Ginsburg's additional guidance as it applies to said standard.

28

*Tackett*, 135 S. Ct. at 933. The Court re-emphasized that a court's objective when interpreting a collective bargaining agreement, as with any contract, is to give effect to the contractual rights and expectations of the parties. *Id.* "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (quoting 11 R. Lord, Williston on Contracts §30:6, p. 108 (4th ed. 2012)). The Court criticized the Sixth Circuit's *Yard-Man* inference for failing "to consider the traditional principle that courts should not construe ambiguous writings to create lifetime promises." *Tackett*, 135 S. Ct. at 936 (citing 3 A. Corbin, Corbin on Contracts § 553, p. 216 (1960)). Instead, "[c]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement." *Id.* (quoting *Litton*, 501 U.S. at 207). The Court also rejected the Sixth Circuit's inference that tying retiree health benefits to the receipt of a pension meant that the parties intended those health benefits to continue for the duration of the pension benefits, that is, for life. *Id.* at 937. The Court concluded that any such "inferences [are] inconsistent with ordinary principles of contract law." *Id.*

While notable, *Tackett* has no major substantive impact on the Third Circuit's decision in *Skinner*. Although the Third Circuit has acknowledged that *Skinner*'s "clear and express" standard amounts to a presumption against vesting, *Smathers*, 298 F.3d at 196, it has not applied the standard as a bright-line rule that

would suspend all discussion of traditional principles of contract interpretation when such language is not present. Rather, when confronted with the absence of clear and express language, the Third Circuit has continued to conduct ambiguity analyses. For example, in *Skinner*, after rejecting "the appellants' contention . . . that the language of the CBAs unambiguously vested lifetime medical and life insurance benefits for retirees," the Third Circuit extensively analyzed appellants' alternative arguments that certain phrases describing retiree benefits were ambiguous and that extrinsic evidence in the form of various testimonies established that an ambiguity existed. *Skinner*, 188 F. at 142-45. The court concluded that the phrases were not ambiguous when read in the context of other collective bargaining agreements between the parties, stating that "extrinsic evidence . . . may *not* be used to create an ambiguity where none exists." *Id.* at 142-45.

As the First Circuit has explained, *Skinner* "does not set forth a strict clear and explicit statement rule." *Senior v. NSTAR Elec. and Gas Corp.*, 449 F.3d 206, 217 (1st Cir. 2006). Instead, "the bulk of the court's opinion in *Skinner* [ ] relied on traditional rules of contract construction to determine the meaning of the CBA," and "undertook an extended discussion of the plaintiffs' argument that the contract was ambiguous, which likely would have been unnecessary had the court in fact relied on a strict clear and express statement rule." *Id.*

This  interpretation receives f urther  support from two subsequent Third

Circuit cases relying on  *Skinner.* In *Int'l Chem. Workers Union Council of the*

*United Food and Commercial Workers Union v. PPG Indus., Inc.*, 236 Fed. App'x

798, 791-93 (3d Cir. 2007), the Third Circuit  considered if retiree health benefits

had vested in order t o determine whether the parties had a dut y to arbitrate under

the CBAs. In deciding that the CBAs' term ination provisions read in conjunction

with those relating to retiree h ealth benefits prevented the vesting of such benefits,

the Third Circuit did not foreclose but instead addressed the union's claim that the

relevant  provisions of the CBAs and      GIPs  created  an ambiguity precluding

summary judgment. *Id.* at 793-94. Seven years late r, in the class action suit  *Lewis*

*v. Allegheny Ludlum Corp.*, 579 Fed. App'x 116, 117-18 (3d Cir. 2014), a group of

retirees  claimed  that their former   employer  had breached   CBAs allegedly

promising lifetime, no cost  health care. After not ing that a presum ption existed

against vesting in welfare benefit plan   cases, the Third Circuit found t  hat the

retirees  had failed to identify any clear      and express langua ge that conferre d

"unalterable,  vested life time  health benefits." *Lewis*, 579 Fed. App'x at    119.

However, later in t he opinion, the Thi rd  Circuit  again bri efly tackled retirees'

attempts to create an am biguity instead of finding that such an argument was

precluded due to a failure to fi nd clear and express language. *Id.* The above cases

thus demonstrate that, in applying a cl ear and express language rule, the Third

Circuit merely enforced a trad itional rule of contract construction, tha t, "[w]here the words of a contract in writing are clear and unam biguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Tackett*, 135 S. Ct. at 933 (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012)).

Based on the foregoing, the court concludes that *Skinner*'s "clear and express" language requireme nt remains bindi ng law in the Third Circuit post-*Tackett*.

### D.   Interpreting the Language of the CBAs

Under *Tackett*, courts must "interpret co llective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles o f contract law, at l east when those principles are not inconsiste nt with federal labor policy." *Tackett*, 135 S. Ct. at 933; *see also Skinner*, 188 F.3d at 138. Because the objective of contract interpretation is to ascertain the parties' intent, *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011) (citing *Am. Eagle Outfitter v. Lyle & Scott Ltd.*, 584 F.3d 575, 587 (3d Cir. 2009)), the contract must be "read to give effect to all its provisi ons and to render them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) (citations omitted).

When interpreting a collective bargaining agreement, a court must:

hear the p roffer of the parties a nd determine if there are objective indicia that, from the linguistic refe rence point of the parties, the

terms of the contract are susceptib le of different meanings. Before making a findi ng concerning t he existence or absence of ambigui ty, we consider the contract langua ge, the meanings suggested by counsel, and the extrinsic eviden ce offered in support of each interpretation. Extrinsic evidence may include the structure of the contract, the bargaining hi story, and the conduct of the parties that reflects their understanding of the contract's meaning.

*Teamsters Indus. Emps. Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 135 (3d Cir. 1993) (citati ons and quotations om itted); *see also Skinner*, 188 F.3d at 142. Thus, a court may find it "neces sary to consider the scope of other related [CBAs], as well as p ractice, usage and custom pertaining t o all such agreements." *Rosano*, 74 F.3d at 190 (quoti ng *Transp.-Commc'n Emps. Union*, 385 U.S. at 161). H owever, extrinsic evid ence may never be us ed "to create an ambiguity where none exists." *Skinner*, 188 F. 3d at 145. While collective bargaining agreements will "often incorpor ate[] express or im plied terms that are designed to give [the parties] a degree of freedom of action with a specified area of activity," *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 308 (1989), "it is elementary that one cannot im ply a term or prom ise in a contract which is inconsistent with an express term of the contract itself." Williston on Contra cts § 63:21; *see also USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 438 (3d Ci r. 1993) ("[O]ne can invoke 'implied' term s only when there are no express term s in the contract relating to the particular issue.").

With the above principles in m ind, the court will turn to the parties' arguments regarding the proper interpre tation of the relevant Plan documents governing the members of each subclass.

### 1. Subclass A

Defendants have m oved for summary judgm ent as to Subclass A. In t heir motion for summary judgm ent, Defendants contend that all benefits arisi ng under the pre-1984 CBAs are subject to the dur ational clauses contained in each individual agreement, and therefore, an y entitlement to retiree ben efits expired along with the relevant CBA and GIP. (Doc . 99, pp. 17-18 of 46.) Plaintiffs, on the other hand, argue that the language of th e 1981 GIP, under which the majority of Subclass A members retired, creates an ambiguity, ther eby precluding the entry of summary judgment for Defendants. (Doc. 102, p. 33 of 43.) Specifically, Plaintiffs point to a 1981 GIP provi sion stating that qualified retirees and eligible defendants "shall have the following benefits . . . co ntinued after retirement at no cost." ( *Id.*) Plaintiffs argue that, un like the phrases "shall rema in" and "will c ontinue" in *Skinner*, this provision does not indicate a continuation of prior pra ctice and policies, but instead indicates a prom ise to provide prospective coverage for the life of the retiree. (Doc. 102, p. 41 of 52.)

As in *Skinner*, a plain reading of the phrase, "shall have the follow ing benefits . . . continued" does not unam biguously indicate that the benefits will be

continued for the life of the retiree notwithstanding the expiration of the applicable CBA. *Skinner*, 188 F.3d at 141. Rather, in light of the durational clauses included in all of the pre-1984 CBAs and the lack of any durational language to qualify the phrase, a more reasonable interpretation is that, as in *Skinner*, the benefits would be continued until the applicable CBA expires. *Id.* For example, Article 37 of the 1981 CBA, which explicitly applied to retiree health benefits per Article 35,[6] stated that the Agreement would "remain in full force and effect until midnight October 31, 1984."[7] (Doc. 97-9, p. 143 of 196.) Thus, read in conjunction with the above durational clause, the promise to have "the following benefits . . . continued" expired at midnight of October 31, 1984. *See Skinner*, 188 F.3d at 141. As such, an employee who retired under the 1981 CBA had no contractual entitlement to continued benefits thereafter. Rather, the benefits existed on a contract-to-contract basis and, thus, had not vested. This interpretation is consistent with *Tackett*'s instruction to follow the important principle of contract interpretation that

---

[6] Article Thirty-Five of the 1981 CBA reads as follows:

> The parties have provided for a Group Insurance Program in a separate booklet which is part of this Agreement as if set out in full herein, *subject to all provisions of this Agreement.*

(Doc. 97-9, p. 142 of 196 (emphasis added).) Thus, while members of Subclass A were provided retiree health benefits, those benefits were subject to all provisions of the CBA, including the durational clause.

[7] Similar general durational restrictions setting an exact expiration date for the agreement's effectiveness can be found in every CBA stretching back to 1973. (Doc. 97-4, p.100 of 129; Doc. 97-5, pp. 107-08 of 153; Doc. 97-7, pp. 111-12 of 166.)

"[c]ontractual obligations will cease, in  the ordinary course, upon termination of the bargaining agreement." *Tackett*, 135 S. Ct. at 937; *see also Gallo v. Moen Inc.*, 813  F.3d 265, 269 (6th Cir.    2016) ("[ W]e  should not expect to find lifetime commitments in time-limited agreements.") (citing *Tackett*, 135 S. Ct. at 936).

Furthermore,  the court does not belie   ve  that the phrase, "shall have the following benefits . . . continued," is ambiguous when read in its proper context. In *Skinner*,  the Third Circuit found that       the phrases "shall remain" and "will continue"  were used to refer back to      previous CBAs and thus represented "a continuation  of  *prior*  practices  and policies," r  ather  than any guarantee o   f unalterable, lifetime benefits. *Skinner*, 188 F.3d at 143. In its proper context here, the  phrase "shall have the following benef      its . . . continued" relates to th   e continuation of certain benefits that re tirees had enjoyed during their employment, such as "Hospital Expense Benefits; Su rgical Expense Benefits; Medical Expense Benefits;  Diagnostic X-Ray & Laboratory Benefits; [and] Prescript       ion  Drug Benefits" (Doc. 97-10, p. 69 of 79), a  nd  certainly does not  guarantee unalterable benefits "prospectively fo r the life of the retiree." *Skinner*, 188 F.3d at 143.  The section immediately following the retiree  continued benefits provision in the 1981 GIP further bolsters this interpretation:

**Benefits NOT Continued After Retirement**

Upon retirement, employees will no lo nger be insured for Accidental
Death and Dismemberment, Survivor Income, Accident and Sickness,
Long Term Disability, Vision Care or Dental Benefits.

(*Id.*) Accordingly, when read i n its proper context, there app ears to be no textual

support for Plaintiffs' argument that the phrase, "shall have the following benefit s

. . . continued" is evidence of  the parties' intent to vest health benefits for the life

of the retirees.

Nevertheless, Plaintiffs argue that      the parties' intent and reasonable

understanding can further  be  derived from  the depos ition  testimony  of Chris

Castle, York International's York Plant  manager who negotiated and executed the

2000  and 2003 CBAs for the Com      pany,  and the 2003 correspondence of Mr.

Castle's  superior, Michael Anderson, York   International's vice president for the

York Plant. (Doc. 102, pp. 36-38 of 43.)  However, there is no  evidence indicating

that either individual participated in the negotiation or execution of the 1981 CBA,

which  describes retiree bene  fits  differently than   the  2000 and 2003 GIPs.   [9]

Although  Plaintiffs point t o  Mr. Cas tle's  testimony that t he  2000 GIP provi ded

benefits  "basically in perpetuity" and   "that the retirees would have health care

coverage until they died, ba sically," (Doc. 102, p. 36 of  43), Plaintiffs must show

---

[9] The 1981 CBA states that "em  ployees who retire  . . . shall have the following benefits . . .
continued  after retirem ent  at no cost" while    the 2000 and 2003 GIPs provide that "health
insurance is continued until your death." (Doc. 97-10, p. 69 of 79; Doc. 97-24, p. 10 of 50; Doc.
97-27, p. 12 of 55.)

"that the employer intended the welfare benefits to be vested." *Skinner*, 188 F.3d at 138-39. It is clear from Mr. Castle's deposition, however, that he did not understand whether the benefits had unalterably vested:

> Q. Do you remem ber if there was ever any di scussion about the company being able to change the benefits for the retirees?
>
> A. I don't think that - - I thought I was advised at the time we can't. I don't know if we can't m eant that it would cause them to lock up and us not to get to where we want to, or because we had some contractual obligation or some other obli gation that prevented us from changing them. But it was just never something that we would go after or chose to. I can't make the differentiation between whether that was policy or because of the contract itself.

(Doc. 96-17, at 47: 7-19). Mr. Castle's lack of understanding on the cri tical issue of vesting thus indi cates that he cannot competently testify as to the Com pany's intent. While Plaint iffs also argue that Mr. Castle's testimony reveals that the Union was unwilling to negotiate regarding benefits for retirees, such testim ony would not equate to an intention on th e part of the Comp any to create an unalterable vested right t o benefits. (D oc. 102, p. 37 of 43.) Similarly, Mr. Anderson's 2003 correspondence speaking of "lifetime" benefits was sent over twenty years after the 1981 CBA's execution and does not indicate an intent to vest benefits sufficient to overcome the expre ss language of t he governing documents. (Doc. 97-18; 97-21 , p. 4 of 6.) At best, Plaintif fs' proffered extrinsic evidence demonstrates that the Company intended retiree welfare benefits to last for the life

of the retiree *subject* to the CBA's duration, and not that the Company intended the benefits to vest "forever unalterabl[y]." *Skinner*, 188 F.3d at 139.

In conclusion, Plaintiffs concede that no contract provision in the 1981 CBA clearly and expressly states that retiree benefits are vested and unalterable, and the court cannot conclude that the provision continuing medical benefits after retirement creates an ambiguity. When the CBA and the GIP are read together and in their entirety, it is clear that "shall have the following benefits . . . continued" is not "subject to reasonable alternative interpretations," *Skinner*, 188 F.3d at 143, but instead refers only to those benefits carried over to retirement from employment and not to an unalterable, lifetime continuance superseding the general durational clauses specifically applicable to all GIP provisions. While extrinsic evidence may be used to determine whether a contract is ambiguous, the lack of ambiguity in the documents precludes Plaintiffs' extrinsic evidence from creating an ambiguity here. Therefore, the court will grant Defendant's motion for summary judgment as to Subclass A.

## 2.   Subclasses C, D, and E

Both Plaintiffs and Defendants move for summary judgment as to Subclasses C, D, and E, for which the CBAs and GIPs in effect from July 1, 1996 to July 30, 2006 apply. In moving for summary judgment as to these subclasses,

Plaintiffs rely on la nguage included in  the 1996 through   2006 GIPs under t he

heading "Termination of Coverage," which states as follows:

> Your health coverage is continued  *until your death* – unless you request
> termination of coverage  or you do not make the   required contribution for
> this Plan. And your dependents' hea lth coverage will be continued –  *while*
> *you are living* . . . . [Surviving spouses]  will remain eligible *until the earlier*
> *of death or remarriage*.

(Doc. 97-12, pp. 94-95 of 175;  Doc. 97-14, pp. 93-94 of 163;  Doc. 97-16, p. 81 of

130;  Doc. 97-18, p. 81 of 130;  Doc. 97-21, pp. 11-12 of 51; Doc. 97-24, pp.10-11

of 50; Doc. 97-27, pp. 12-13    of 55 (em phasis added).) Pl aintiffs argue that t he

italicized language unam biguously  establishes that m embers of these subclasses

have a right to vested, uncapped benef  its extending beyond the relevant CBA's

expiration. In support of their ar   gument, Plaintiffs note that the   *Skinner* court

postulated that a CBA phrase providing that  retiree benefits "will continue for the

life of the retiree" may indicate an intent   to vest. Defendan ts, on the other hand,

contend that they are entitled to summ ary judgment as to Subclasses C, D, and E

because no language in the pertinent CBAs  or GIPs clearly indicates an agreement

that the Company would provide vested lifetime health benefits to retirees, and that

any benefits entitlement expired along with the relevant CBA.

While at first glance the phrase "until  your death" appears to be coextensive

with the Third Circuit's hypothetical  phrase "for the life of the retiree,"  *Skinner*,

188 F.3d at 141, the  court cannot read t he phrase "until your death" in a vacuum.

Rather, the court must interpret the con tract in a manner that gives reasonable meaning to all of its provisions and gi ves effect to all provisions of the contract. *See* 11 Williston on Contracts § 32:5 (4th ed.) (stating that a contract must "be read as a whole and every part will be read with reference to the whole"). In the context of collectively-bargained retiree health benefits, an em ployer's obligation t o provide health benefits typically expires when the CBA expires. *Tackett*, 935 S. Ct. at 936-37 ("[C] ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement .") As with Subclass A, each of the CBAs and GIPs applicable to S ubclasses C, D, and E include d durational clauses wit h exact expiration dates that have since e xpired. Read in conjunction with t he relevant durational clause, the "unti l death" language must therefore be interpreted to mean that a retiree is entitled to the benefits provided by the CBA, by way of the corresponding GIP, for the entire term of the CBA, but that such benefits terminate in the event of the retiree's death if it should occur during the term of the CBA.

In *Crown Cork & Seal Co., Inc. v. Int'l Assoc. of Machinists and Aerospace Workers*, 501 F.3d 912 (8th Cir.), the Eighth Circuit addressed nearly identical language to that at issue here:

> Your personal coverage continues until your d eath. Your Dependent spouse's coverage continues after your death until the earlier of his or her death or rem arriage. Your Dependent children's coverage continues after your death . . .

41

*Id.* at 918. While finding that a strong     reservation of rights clause precluded vesting, the court noted that, even without     the reservation of rights clause, the above language providing benefits "until death" did not represent "explicit vesting language." *Id.* Likewise, in *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476 (7th Cir. 2006), the Seventh Circuit held that si   milar language only provided the retirees with lifetime health coverage to last during the effective periods of the CBAs under which they retired. *Id.* at 482-83. Here, as in    *Crown* and *Cherry*, the expressed durational limits indicate that retiree hea  lth benefits were  no longer guaranteed after the CBA's expiration, but instead were subject to renegotiation.

Indeed, the parties understood that ex    isting retiree health benefits were subject to modification each time the par ties reconvened to negotiate a new labor contract, and often t he benefits were, in  fact, altered. Together, these GIP to GIP alterations are evidence of the parties' custom and practice, establishing that retiree benefits were not vested but i nstead subject to bargaining with every new CBA. *See John Morrell & Co. v. United Food and Commercial Workers Int'l Union, AFL-CIO*, 37 F.3d 1302, 1307 (8th  Cir. 1994) (citation om itted) ("[T]he fact that modifications were routi nely negotiated is  fundamentally inconsistent with the notion that *any* retirement health benefits were     *ever* vested.") Courts ha  ve reconciled the contract-to-contract nature of collective bargaining with "lifetim e" language by concluding that the obligation to provide lifetime benefits ended with

the expiration of the relevant CBA. *Cherry*, 441 F.3d. at 482; *PPG*, 236 F. App'x at 793. As the Seventh Circui t has expl ained, "[t]he problem for the plaintiffs i s that 'lifetime' may be construed as ' good for li fe unless revoked or m odified.'" *Vallone v. CAN Fin. Corp.*, 375 F.3d 623, 633 (7th Cir. 2004) (citation om itted). The *Cherry* court, addressing a spousal provi sion nearly identical to t he one at issue here, similarly concluded:

> The retirees argue that the [CBA] is implicitly extended beyond its three-year term by a clause that provides be nefits for surviving spouses until their death or remarriage. This provision, ho wever, refers to the eligibility of individuals to receive benefits under the agreement, not to the duration of the agreement. Surviving spouses were eligible to receive benefits *only so long as the [CBA] was in place*.

*Cherry*, 441 F.3d at 483 (emphasis added). Here, as in the above cases, language stating that health coverage is provided until the retirees' or their spouses' "death " means that the parties negotiated lifetime health coverage to last during the term of the CBA under which the individual retiree retired.

Relying on *Bland v. Fiatallis N.A., Inc.*, 401 F.3d 779 (7t h Cir. 2005), Plaintiffs nonetheless argue that, in the ab sence of an express reservation of rights clause, the "unt il death" language at issu e here is durationa l language indicating that retiree benefits outlast the expiration of t he relevant CBA. *See id.* at 786 (holding that, "in the absence of a reserv ation of rights clause, we are convinced (not surprisingly) that . . . 'lifetime' is durational, meaning 'for li fe.'"). However, the *Bland* court clarified that "until death" is not the functional equivalent of t he

lifetime language before it, which was "stronger and more explicit than language in comparable cases." *Id.* In doing so, the court poi nted to a Fifth Circuit case with weaker language involving a CBA "sta ting that retirees were entitled to comprehensive medical benefits 'until the death of the retired employee.'" *Id.* (citing *Int'l Ass'n of Machinists & Aerospace Workers, Woodworkers Div., AFL-CIO v. Masonite Corp.*, 122 F.3d 228, 233 (5th Cir. 1997) ). The Fifth Circuit, in turn, found that the phrase "until death" does not autom atically vest lifetim e benefits, but instead "can be construed either as a li miting or right-grant ing provision." *Masonite*, 122 F.3d at 234-235. Here, in the presence of strict durational language in the CBAs and incorporated GIPs, the "until death" language is not a lifetim e guarantee of unalterabl e benefits extending beyond the contract's expiration but is instead a li miting provision. The retirees were entitled to benefits during the term of the applicable CBA, unl ess their death came before the CBA' s expiration.

Furthermore, although the CBAs and GIPs applicable to Subclassses C, D, and E lack an express reservation of rights clause, [10] two provisi ons appearing

---

[10] Plaintiff's suggest that the 1996 swi tch to two separate GIP booklets—one for active employees and one for retirees—is s uggestive of the parties' intent to vest benefits f or retirees. Specifically, Plaintiffs argue that the omission of reservations of rights langua ge in the retirees' portion of the split GIP booklet "s hows that the parties d id not inten d that the reservation o f rights apply to retirees." (Doc . 102, p. 31 of 43.) However, *Tackett* and *Skinner* preclude the court from inferring a vested benefit in the abse nce of clear and express language demonstrating the employer's agreement to provide a lifetime benefit. Here, no such vesting language exists.

immediately before and after the dispute d "until death" provision indicate that the Company retained the power to amend, m odify, or terminate the retirees' benefits. Together,  the provisions provide tha   t,  "[i]n  the event [the]     group plan is terminated, coverage for [retirees ] and [t heir] dependents wil l end immediately," but that retirees will retain the  option to  convert their group insurance policies to individual health insurance policies. (*See* Doc. 97-21, pp. 11-12 of 51; Doc. 97-24, pp.  10-11 of 50; D  oc. 97-27,  pp. 12-13 of   55.) In addressing nearly identical language, the Tenth Circuit found t hat the  conversion  clause, together "with t he provision  stating that insu  rance  terminates  when  the policy termin  ates, . . . demonstrates [that the d]efendants had the power to terminate a retiree's group life insurance benefit." *Fulghum v. Embarq Corp.*,  785 F.3d 395, 406-07 (10t  h  Cir. 2015). Here, as in  *Fulghum*, these provisions indicat e that the Co mpany  retained the power to termin ate benefits, and, as  such, any intent to vest benefits would have rendered the provisions superfluous.

Finally, a review of the ex trinsic evidence in this case further supports t  he court's interpretation of the relevant contractual language. As discussed in relation to  Subclass A, Mr. Castle did not     know  whether the bene fits  were unalterably vested. In addition, although Pl aintiffs argue that Mr. Castle's testim ony indicates that the Union refused to negotiate retir  ee benefits, a refusal to negotiate by the Union does not equate with the Com pany's vesting of lifetime benefits or inability

45

to reserve its right to amend, modify, or terminate benefits. Furthermore, any notion that the Union refused to negotiate is contradicted by the periodic renegotiation of the GIPs, which necessarily required bargaining between the parties. Indeed, Plaintiffs concede this point by arguing that these "detrimental changes to existing retirees' benefits … w[ere] part of a broad package of improvements the Union negotiated" (Doc. 102, p. 41 of 43), thus indicating that the Union could and did negotiate retiree benefits. Furthermore, Mr. Anderson's July 7, 2003 and July 23, 2003 correspondence[11] referring to "lifetime" benefits fail to distinguish between "lifetime" benefits until the CBA expired or lifetime benefits extending past CBA expiration. In addition, Mr. Anderson's references to early retirement options offered by the Company reveal that these options were the subject of negotiation, a fact reflective of the parties' practice to modify retiree benefits with every new GIP and incompatible with vested benefits. As a result, the

---

[11] The court is referring to Mr. Anderson's July 7, 2003 letter (Doc. 96-18) and his July 23, 2003 e-mail (Doc. 96-21). Mr. Anderson's letter addressed the ongoing 2003 CBA negotiations' importance to York Plant employees. (Doc. 96-18.) The letter references a Company proposal offering an early retirement option that would provide "early pension and lifetime flexchoice medical benefits" to minimize the negative effects of job reductions on plant employees (*id.* at p. 4), and urges employees to consider the importance of "retaining a Lifetime Medical Plan" in a difficult economy (*id*). Mr. Anderson's July 23, 2003 email stated that employees "affected by layoffs due to product moves . . . will receive a combination of lifetime medical plan and early pension at an abated amount." (Doc. 96-21, p. 4 of 6.) The court notes that both the letter and e-mail refer to the Company's intent to move employees from their current UAW benefit plan to a FlexChoice benefit plan, the latter of which was "a lower cost plan to the Company." (Doc. 97-18, p. 3-4; Doc. 97-21, p. 4.) Thus, the email and letter reflect the Company's concern with the "administration and increase [in] the cost of [those] plans," which was the motivating factor behind Congress's rejection of the automatic vesting of welfare benefits. *Skinner*, 188 F.3d at 138.

46

court finds that reading Plaintiffs' cumulative extrinsic evidence in their suggested light would result in finding implied terms inconsistent with the CBAs' and GIPs' express terms and would create an ambiguity where none exists.

In conclusion, the CBAs and GIPs have explicit durational clauses providing the exact date and time when those documents ceased to be in effect, as well as additional language contemplating the termination of retiree health benefits. In the face of these provisions, the "until death" language does not constitute clear and express vesting language sufficient to overcome the durational provisions. Because *Tackett* instructs that such durational language must be given effect, the court finds that the CBAs and GIPs governing Subclasses C, D, and E did not promise any benefits beyond the expiration of the relevant contract. Plaintiffs vesting claims thus fail, and summary judgment will be entered in favor of Defendants as to these Subclasses.

### 3.    Subclasses B and F

Defendants have moved for summary judgment as to Subclasses B and F, arguing that, in addition to lacking clear and express vesting language beyond the expiration of the relevant CBA, the reservation of rights clauses contained in the applicable plan documents foreclose any claim of vesting. (Doc. 99, pp. 26-27, 34-35 of 49; Doc. 108, pp. 14-16 of 60.) While Plaintiffs do not dispute that the documents contain reservation of rights clauses, they argue that the Union strongly

47

objected to the inclusion of the language within the plan documents and, therefore, the provisions are not a valid part of the plan. (Doc. 102, pp. 31-33 of 43.)

The plan documents governing Subclasses B and F contained express reservations of rights language. The 1984, 1987, 1990, and 1993 GIPs governing Subclass B granted the Company "the right to modify, amend, suspend or terminate [the plans] at any time." (Doc. 97-12, p. 162 of 175; Doc. 97-14, pp. 150-51 of 163; Doc. 97-16, p. 122 of 130; Doc. 97-18, p. 122 of 130.) The 2006 GIP governing Subclass F assigned the Company the "right to amend or terminate the benefits program or any portion of it at any time." (Doc. 97-28, pp. 3, 105 of 108.) This language is nearly identical to language which the Third Circuit has found to preclude any claim of vesting. *See Schoonejongen v. Curtiss-Wright Corp.*, 18 F.3d 1034, 1038 (3d Cir. 1994) (finding no vesting where plan documents stated that "the Company reserves the right at any time and from time to time to modify or amend, in whole or in part, any or all provisions of the plan").

Indeed, Plaintiffs do not dispute that such language constitutes the type of reservations of rights clause that forecloses any claim of vesting. Instead, Plaintiffs argue that the reservation of rights clauses should not be considered part of the retiree benefit plans because the clauses were never negotiated by the parties. (Doc. 102, p. 31-32 of 43.) In support of their argument, Plaintiffs point to the testimony of Richard Sindlinger, a Union negotiator from 1973 to 2004, and Blaine

Cunningham, a Union negoti ator from 1986 to 2006. Si ndlinger testified, in pertinent part, that the reservation of ri ghts clauses were never part of the GIPs but were instead part of "a document the co mpany wanted to put in this bookle t because of ERISA. This was not negotiated be tween the parties. It was n ot part of the actual plan." (Doc. 103-3, p. 24 of 52. ) Cunningham similarly testified that the parties did not negotiate the Subclass F rese rvation clauses. (Doc. 103-6, p. 23 of 24.) Plaintiff's arguments are unavailing.

The inclusion of a reservation of ri ghts clause in every GIP booklet from 1984 to 2006 indic ates a deliberate choi ce to not only include but renew the provision with each new CBA. In fact, Sindlinger testified that the Union allowed the section to go into the bookl et. (Doc. 103-3, p. 24 of 52.) While he now states that it was onl y included as a "good-faith bargaining" tactic and to save the Company the additional cost of printing a separate booklet (*id.* at pp. 25, 28 of 52), the Union never objected to its inclusion t hrough a grievance or lawsuit. Plaintiffs' belated objection now, decades after the f act, undermines their posit ion and runs contrary to fundamental princ iples of cont ract law. Indeed, in cases such as this where there is an unam biguous reservation of rights clause contained i n the plan documents, it is inappropriate to resort to extrinsic evidence at all. *See Skinner*, 188 F.3d at 145-46 (refusing t o consider ex trinsic evidence re garding the union members' belief that the parties' past practices trumped contract language); *see*

*also Maytag Corp. v. UAW Local 997*, 687 F.3d 1076, 1086 (8t h Cir. 2012) ("When the applicable [plan document] . . . 'explicitly reserves the right to m odify the retiree medical benefit plan at any time,' beneficiaries 'have not met the burden of proving vesting language,' and extri nsic evidence may not be considered.") (citation omitted). Instead, the reserv ation of rights clause prevails. *See In re Unisys Corp.*, 58 F.3d at 903-04 (stating t hat if a "reservations of rights [clause] is broad and unequivocal, it will prevail over a promise of lifetime benefits.")

In conclusion, the reservation of rights language applicable to Subclasses B and F is clear and unambiguous, and forecloses any notion of vesting. As such, any testimony regarding the Union's alleged resistance to the inclusion of the language is irrelevant. Thus, the court will gran t Defendants' motion for summary judgment as to Subclasses B and F.

## V.        <u>Conclusion</u>

For the reasons set forth above, th e court will deny Plaintiffs' m otion to strike and grant Defendant's motion for summary judgment as to all Subclasses.

An appropriate order will issue.


                                                s/Sylvia H. Rambo
                                              United States District Judge


Dated: March 31, 2016